Filed 7/29/26  In re S.L. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re S.L., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH AND HUMAN SERVICES DEPARTMENT,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.L.,<br><br>    Defendant and Appellant. | A175900<br><br>(Solano County<br>Super. Ct. No. JD2500005) |

D.L. (Father), father of minor S.L., appeals the juvenile court's order denying his motion to terminate dependency jurisdiction.  He contends the court erred in continuing jurisdiction under a family maintenance plan because he successfully ameliorated the conditions that led to the initial assumption of jurisdiction.  We conclude the court did not abuse its discretion in continuing jurisdiction due to concerns with Father's failure to fully comply with the substance abuse treatment components of his case plan. Accordingly, we affirm.

1

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Initial Petition and Detention

In January 2025, the Department filed a petition under section 300, subdivisions (b)(1) and (j), on behalf of 19-month-old S.L., alleging her parents failed to provide adequate care and supervision for the minor, and her mother, M.B. (Mother), had previously lost parental rights over three of S.L.'s half siblings. The petition alleged a fire had destroyed the family's mobile home trailer, causing injury to all three residents, including S.L. Father said the fire was caused by an unattended camp stove he was using to heat the residence. After the family was transported to a hospital, Mother tested for positive for methamphetamine and claimed she "had inhaled what the father was 'cooking.'" The petition alleged both parents' lack of adequate care and supervision of S.L., as well as Mother's untreated substance abuse problem, placed the child at substantial risk of serious physical harm, abuse, and/or neglect.

During the Department's investigation, Father reported he was S.L.'s primary caregiver because Mother suffered from mental health issues. Mother had an extensive child welfare history involving substance abuse and three prior dependency cases that ended in the termination of her parental rights. Father acknowledged his own drug use and a felony drug charge pending against him.

At the detention hearing on January 23, 2025, Father was found to be S.L.'s presumed father. The juvenile court ordered that S.L. be detained and placed with a maternal relative.

### B. Jurisdiction and Disposition

In February 2025, the Department filed a jurisdiction and disposition report recommending S.L.'s removal from the parents' custody, with

reunification services provided only to Father. According to the report, Father admitted both he and Mother used methamphetamine on the day of the fire. In January and February 2025, Father tested positive for marijuana and alcohol, and he had been arrested in August 2024 for possession of methamphetamine. Mother did not participate in the Department's investigation. In February 2025, a hair-strand test confirmed the minor's exposure to methamphetamine.

The Department filed an amended petition adding allegations that Father had a history of substance abuse from which he failed to rehabilitate and which impairs his judgment and ability to provide care, supervision, and protection for S.L., placing the minor at substantial risk of serious physical harm or illness.

At the jurisdiction and disposition hearing in March 2025, the juvenile court sustained the allegations under section 300, subdivisions (b) and (j), and ordered S.L.'s removal. The court ordered supervised visitation for both parents, and reunification services for Father, but not for Mother.

**C. Six-Month Review**

In August 2025, the Department filed a status review report recommending that S.L. be returned to Father's care because he had made adequate progress in addressing the issues that led to the dependency proceedings. According to the report, Father was in sober living housing and had successfully completed a substance abuse treatment program. He reported he would continue to participate in Narcotics Anonymous ("NA") meetings.

The Department reported that in February 2025, Dr. Quynh-Uyen Smith of Solano County Family Health Services diagnosed S.L. with fine motor delay, social/emotional delay, and speech delay, and referred the minor

for occupational therapy, psychological services, and an audiology evaluation. Dr. Smith also referred S.L. to Jigsaw Diagnostic for an autism assessment. The autism assessment was completed in May 2025, and the results showed that S.L. met the criteria for autism spectrum disorder. Accordingly, the evaluator recommended that S.L. participate in comprehensive intensive speech therapy, occupational therapy, and applied behavior analysis ("ABA"). Father disagreed with the diagnosis and requested a reassessment.

In August 2025, the juvenile court returned the minor to Father's custody under a family maintenance plan.

**D. Family Maintenance Review Report**

In January 2026, the Department submitted a review report recommending continued court supervision. The Department found that Father had made progress, particularly in individual and family therapy, but there were still concerns about his ability to address S.L.'s developmental, medical, and therapeutic needs.

The Department reported concerns about Father's lack of candor and diligence regarding the minor's medical and health care needs. Father had falsely reported that S.L. received dental treatment in November 2025 and had no cavities; in fact, she had not been treated until December 2025, and she did have cavities requiring further treatment. Additionally, although S.L. had been referred for an audiology evaluation in February 2025, Father did not follow through until eight months later, resulting in the appointment being scheduled nearly a year after the initial referral.

The Department further reported that Father impeded the implementation of recommended ABA services based on his insistence that S.L. did not have autism. In September 2025, Father told the Department that co-educational rights holder, Rose Marie Crouch, and ABA providers had

4

advised him S.L. no longer required ABA services.  Ms. Crouch denied making such statements.  Father also reported that North Bay Regional Center ("NBRC") had completed an in-home assessment of S.L. and concluded services were no longer required.  The Department contacted ABA services provider Peak Potential, and a staff member told the Department that when she contacted Father about an insurance issue, Father informed her that "he no longer needed their services as [S.L.] had been approved for services elsewhere," which was untrue.

During a December 2025 meeting with the Department, Father reiterated his disagreement with the autism diagnosis and stated his belief the assessment was flawed because it relied on incorrect information from maternal aunt and was conducted through "telehealth."  The social worker explained that reassessment was available through NBRC and that Department would continue to provide speech and occupational therapy and ABA services.  Father acknowledged he had initially permitted in-home services but later terminated them because he believed the provider lacked adequate training.  When asked for permission to communicate with NBRC about S.L.'s services, Father "was adamant that 'everyone' states that [S.L.] is 'normal' and that she was assessed too early" for autism.

Although Father had been actively involved in family therapy, the therapist reported challenges with Father's communication and parenting skills.  Father referred to S.L. as a " 'brat' " and believed she was "acting out on purpose and at times respond[ed] with directives that a two-year-old cannot realistically understand. "  In the therapist's view, Father required additional education on strategies and appropriate responses for when S.L. was acting out.

The Department also reported concerns regarding Father's continued relationship with Mother. Mother acknowledged Father had visited her workplace and requested that she not disclose the contact to the Department or the juvenile court. She further reported that she had provided Father with financial assistance.

Father's case plan required him to participate in recovery services, maintain a support network, and develop a relapse prevention plan. Although Father had identified his support network, he declined to discuss a relapse prevention plan and refused to identify individuals such as a meeting facilitator who could verify his attendance at NA meetings. Father's reason for his refusal was that "he feels his sobriety is for himself and does not need to be proven" to the Department. When asked for the name of the person running the NA program, Father "remained adamant that he would not provide any information." Between August and December 2025, Father completed eight of 11 random drug tests, missed two tests, "which were not forgiven," and tested positive for marijuana on three occasions.

### E. Contested Family Maintenance Review Hearing

In March 2026, the juvenile court conducted a contested family maintenance review hearing under section 364. The hearing proceeded mostly on documentary evidence, including the stipulated offer of proof of social worker Patricia Fletcher, which we now summarize.

Fletcher had worked with the family since August 2025, and she stated there were no present concerns regarding Father's housing. However, since the filing of the Department's January 2026 report, Father had "refused to sign his case plan and to participate in the [child and family team meeting] to identify current strengths, worries, and mental health needs for [S.L.], . . . stating that he is 'busy.' "

6

Regarding Frather's three positive drug tests, Fletcher explained that "[t]he levels of the tests are not decreasing, indicating that he is currently using marijuana." Fletcher verified that Father's medical marijuana authorization was online, but that the website stated a card "can be obtained in 'about 10 minutes' for $39."

Fletcher further indicated that S.L.'s audiology appointment had been rescheduled for March 16, 2026. Father followed up with the insurance provider regarding ABA services and obtained an authorization for an autism assessment, but the address in the insurance portal needed to be corrected. A representative with NBRC told Fletcher that S.L. could be assessed for autism when she is 3 years old and that "[t]here is no way to fast track this assessment with NBRC."

According to Fletcher, the family therapist stated Father was still working on understanding " 'toddlerhood' " and learning appropriate responses for when S.L. acts out, as he "speaks to [S.L.] in a manner that [a] two-year old cannot understand." In February 2026, Farrah Ledbetter, the in-home speech therapist, reported concerns about Father's words and conduct around S.L. "[A]t the end of session on 2/9/26, [S.L.] did not want to give me a toy back. [Father] called her a 'rotten child.' He took it out of her hand and she started fussing. He called her a 'Brat.' As the therapist was leaving, [S.L.] was standing in front of the door. He told her to move. When she didn't move, he grabbed her arm and pulled her back. She did not cry, but she did fuss a little. He is very impatient with her."

Fletcher also reported that she received an email from Ledbetter's supervisor, Nicole Armaz, confirming Ledbetter's concerns about Father's verbal and physical behaviors towards S.L. According to Armaz, during the February 9, 2026 session, Father "was very rough with [S.L.]," grabbed and

yanked her by the arm, and shouted "unkind words" at her. When Fletcher discussed the matter with Father in late February 2026, he stated his belief that S.L. is " 'manipulative,' and knows what she is doing when she is acting out, as she is doing it solely to get her way." Based on the concerns noted by the in-home speech therapist, her supervisor, and the family therapist, Fletcher recommended that Father receive additional parenting courses to address alternative modes of discipline specific to toddlers and children with special needs.

The juvenile court found that continued jurisdiction was necessary. The court explained that while Father had found proper housing, the court still had "serious concerns whether he . . . is able to meet the minor's emotional and health needs at this time." In the court's view, Father had not been "entirely truthful with the Department," had failed to demonstrate consistent follow-through with medical appointments, including the audiology appointment, and had "declined to cooperate with the Department" with regard to providing information on his attendance at NA meetings. Though Father provided some documentation of his attendance at NA meetings, the court remarked, "I do have some concerns whether those are correct. They were not able to be confirmed by the Department. [Father] did not provide enough information for that to occur," as he declined to provide the meeting facilitator's contact information, and "chose not to specify the frequency of his attendance, stating he attended meetings when he was able.' " The court found that Father's lack of cooperation did not allow for "a thorough assessment of his progress."

Also of concern to the juvenile court were Father's continued contact with Mother without the Department's permission, and his lack of understanding of the minor's developmental and emotional needs, as Father

minimized S.L.'s autism diagnosis and used inappropriate physical discipline and derogatory language toward the child. The court recognized Father's right to dispute the autism assessment but expressed concern "that he may not follow through with that assessment if the Court was to terminate jurisdiction today." Finally, the court found that Father continued to require additional parenting education and support to develop appropriate age-based parenting skills and to adequately address the needs of a child with developmental challenges.

## DISCUSSION

### A. Section 364 and Standard of Review

Section 364 pertains to postdisposition review hearings in the juvenile court when a minor is not removed from parental custody. (*In re N.S.* (2002) 97 Cal.App.4th 167, 171.) Under the statute, "[a]fter hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the social worker or his or her department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn. Failure of the parent or guardian to participate regularly in any court ordered treatment program shall constitute prima facie evidence that the conditions which justified initial assumption of jurisdiction still exist and that continued supervision is necessary." (§ 364, subd. (c).)

Section 364 "establishes a 'statutory presumption in favor of terminating jurisdiction and returning the children to the parents' care without court supervision.'" (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1155.) The juvenile court's determination on whether to continue jurisdiction

9

must be based on the totality of the evidence (*In re D.B.* (2015) 239 Cal.App.4th 1073, 1086 (*D.B.*)), including the supplemental report of the social worker, who must "make a recommendation regarding the necessity of continued supervision" (§ 364, subd. (b); see Cal. Rules of Court, rule 5.706(c)(1)).  "If the court retains jurisdiction it shall continue the matter to a specified date, not more than six months from the time of the hearing, at which point the court shall again follow the procedure specified in subdivision (c)."  (§ 364, subd. (d).)

We review the juvenile court's decision to continue jurisdiction for abuse of discretion.  (See *In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7 (*A.J.*).)  "A court abuses its discretion only when ' " 'the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.' " ' "  (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)  We review the court's factual findings for substantial evidence, viewing the evidence in the light most favorable to the court, and drawing all reasonable inferences in favor of the prevailing party.  (*A.J.*, at p. 535, fn. 7; *In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)

**B. Analysis**

Father argues that continued jurisdiction was not justified because he successfully ameliorated the conditions that led to the dependency (e.g., the family's homelessness after the fire, Father's methamphetamine use).  He further maintains that his resistance to the autism diagnosis was well-founded and not grounds for continuing jurisdiction, as NBRC acknowledged it does not assess minors until age three.  As for the court's concerns about Father's parenting skills, Father argues that jurisdiction is not to be continued under section 364 simply because a parent could benefit from more

services; rather, continued jurisdiction is appropriate only if the original conditions that justified initial assumption of jurisdiction still exist.

The Department contends jurisdiction was properly continued due to, among other things, Father's failure to diligently follow through with S.L.'s dental and audiology appointments, his lack of candor with the Department, his minimization of S.L.'s autism, and concerns over his parenting judgment and skills. Notably, the Department does not respond to Father's broader analytical point that in order to overcome section 364's presumption in favor of terminating jurisdiction, the conditions justifying continued jurisdiction must be the same as those underlying the initial assumption of jurisdiction.

There is a potential split among the appellate courts on this score. Division Five of the Second Appellate District concludes section 364 "does not literally require that the precise conditions for assuming jurisdiction under section 300 in the first place still exist," rather, it is sufficient "that conditions exist that '*would* justify initial assumption of jurisdiction.' " (*In re J.F.* (2014) 228 Cal.App.4th 202, 210.) But Division Three of the Fourth Appellate District has stated in dictum that "the better interpretation of section 364(c) is that the court must terminate jurisdiction if the conditions that justified taking jurisdiction in the first place no longer exist." (*D.B.*, *supra*, 239 Cal.App.4th at p. 1085.) *D.B.* reasoned that "[b]y using the phrase 'the conditions still exist,' the Legislature meant the conditions existing at the time of initial assumption of jurisdiction continued to exist at the time of the hearing, not that new conditions have arisen." (*Ibid.*) A leading secondary treatise appears to endorse *J.F.*'s view, stating: "It is hard to imagine that the Legislature intended that dependency jurisdiction be dismissed when the current circumstances suggest the family is at a high risk for returning to the system albeit on different grounds." (Seiser &

11

Kumli, Cal. Juvenile Courts Practice and Procedure (2026 ed.) § 2.150[3], p. 2-679.) In any event, we think Father has a point that the court's decision to continue jurisdiction was based in part on grounds that do not comport with either *J.F.* or *D.B.*

The condition that led to the initial assumption of jurisdiction under section 300, subdivision (b), was Father's lack of adequate care and supervision of S.L. after he caused the fire that destroyed their home and injured the minor. The petition was later amended to include allegations of Father's substance abuse. But because Father's resistance to the autism diagnosis and failure to diligently follow through with medical appointments were not conditions that existed at the time of initial assumption of jurisdiction, they were not grounds for continuing jurisdiction under the rule of *D.B.* (*D.B.*, *supra*, 239 Cal.App.4th at p. 1085.)

Likewise, under *J.F.*, Father's resistance to the autism diagnosis and failure to diligently follow through with medical appointments were not conditions that would themselves justify assumption of jurisdiction under section 300. Nothing in the record or the Department's briefing suggests these were conditions that met the criteria of section 300, subdivision (b), of a "substantial risk" of "serious physical harm or illness," or any other subdivision of section 300. As Father points out, an autism assessment through NBRC was not yet available for S.L. And it appears that despite the initial delay, the dental and audiology appointments were on track to be completed. We see nothing in the record that suggests the delay placed S.L. at substantial risk of serious physical harm or illness. Without more, we

cannot say these would be new grounds for assuming (and therefore continuing) jurisdiction.[1]

That said, we conclude the juvenile court did not err in continuing jurisdiction based on concerns with Father's compliance with the substance abuse treatment components of his case plan. Father emphasizes he successfully abstained from methamphetamine use throughout the dependency proceedings. We applaud his efforts. Still, his 14-month abstention from methamphetamine use was a relatively brief period of time compared to his decades-long history of substance abuse, and in the review period prior to the section 364 hearing, Father tested positive for marijuana three times.[2] Although a parent's use of marijuana, " '*without more*,' " does not justify the juvenile court's exercise of jurisdiction (*In re Destiny S.* (2012) 210 Cal.App.4th 999, 1003), here there was more. In addition to his positive tests for marijuana, Father missed two drug tests, which may properly be considered the equivalent of positive tests for substance abuse. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217, disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560.) Meanwhile, Father flatly refused to develop a relapse prevention plan and identify people who could verify his attendance at NA meetings. And in insisting that "his sobriety is for himself and does not need to be proven" to the Department, Father

---

[1] The juvenile court ordered S.L.'s medical, dental, and mental health treatment pursuant to section 362, which authorizes the court to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (§ 362, subd. (a).) The parties do not address, and we therefore do not consider, whether a parent's failure to diligently comply with a section 362 order would by itself be grounds for continuing jurisdiction under section 364.

[2] The record contains a doctor's authorization for Father's use of medical marijuana.

exhibited a troubling lack of awareness of the problems that led to the initial assumption of jurisdiction. Viewing the record in the light most favorable to the court's decision, the evidence of Father's stubborn resistance to key aspects of the case plan relating to substance abuse, coupled with his long history of substance abuse and instances of his lack of candor with the Department, supported the court's concern that the substance abuse problems that led to the initial assumption of jurisdiction still existed or were likely to exist if supervision was withdrawn. (§ 364, subd. (c).)

Finally, the juvenile court's decision to continue jurisdiction was also appropriately based on concerns about Father's physical discipline of S.L. and lack of good parenting judgment. While the fire was the main event that triggered dependency jurisdiction, the broader issue it presented was Father's poor judgment and attentiveness and the resulting risks to S.L. The same concerns were reinforced during the dependency proceedings when Father handled S.L. in a "very rough" manner and "yank[ed] her arm" while "shouting unkind words" at her, all in the presence of the in-home speech therapist. Viewing the record in the light most favorable to the court's decision, concerns about Father's parenting judgment were properly considered as part of the totality of the circumstances in assessing whether continued court supervision was necessary for S.L.'s physical safety and wellbeing.

For these reasons, we conclude the juvenile court did not abuse its discretion in continuing dependency jurisdiction under a family maintenance plan.

## DISPOSITION

The order denying the motion to terminate jurisdiction is affirmed.

14

         _____

         Fujisaki, Acting P. J.

WE CONCUR:


_____

Petrou, J.


_____

Rodríguez, J.


*Sonoma County HHSD v. D.L.* (A175900)